[Crim. No. 8247. Second Dist., Div. One. Nov. 1, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. ANTONIO DIAZ GOMEZ, Defendant and Appellant.

*Assigned by Chairman of Judicial Council.

Antonio Diaz Gomez, in pro. per., for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Louis L. Selby, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, J.—By an information filed October 17, 1961, defendant was charged with a violation of section 11500, Health and Safety Code (possession of heroin). Defendant, who was represented by counsel, pleaded not guilty and a jury trial was waived.

The trial court found defendant guilty and a probation officer's report was ordered. Defendant's motions for a new trial and for probation were denied, and he was sentenced to the state prison for the term prescribed by law. Defendant appeals from the judgment and from the order denying his motion for a new trial.

Officer Dismukes testified that he had been a police officer of the City of Los Angeles for over 12 years. For seven years he had been assigned to the narcotics division. In the early hours of the morning of September 25, 1961, he and his

partner, Sergeant McMillan, were on duty. They were in plain clothes and riding in an unmarked police vehicle proceeding in a northerly direction in the 700 block of North Broadway. This was an area of bars and stores; an area "known for a lot of narcotics activity."

At this time the officers observed defendant walking on the east side of the street also heading north. Defendant kept looking back over his shoulder in the direction of the officers.

The officers turned their car into a service station lot on the corner. Defendant turned right and proceeded about 6 or 7 feet along the edge of a building at 750 North Broadway. The area was well lighted as there were two overhanging street lights on either side of the street, the nearer being about 20 feet from defendant. At this time defendant was approximately 80 to 100 feet from the officers. Officer Dismukes stated that he observed defendant bend slightly and with his right hand drop an object about the size of a cigarette package on the ground. Officer Dismukes further testified as follows in pertinent part:

"Q. Then what, if anything, did you or your partner do at that time? A. . . . I ran over to where I had seen this motion and picked up a Pall-Mall cigarette package, a crumpled cigarette package lying on the ground, opened it and observed some white paper bindles in it; returned to the vehicle and apprehended the defendant.

"Q. Now, you say you picked up a Pall-Mall package? A. Yes, sir.

"Q. And what, if anything, was in that particular area that you picked up this pall [sic]-Mall cigarette package? A. Oh, there were rocks and a couple of beer cans.

"Q. And when you picked up this Pall-Mall cigarette package, did you examine the inside of it? A. I just opened it, looked in, saw the bindles, and that was all.

"Q. Do you remember how many bindles you saw? A. There were six.

" . . . . . . . . . .

"Q. And are you familiar with the manner in which heroin is packaged? A. Yes, I am.

"Q. And in this area, how is heroin packaged? A. It is sometimes packaged in paper bindles. They put the powder in a small piece of paper, folding it over and tucking the ends in to make a small bindle out of it.

" . . . . . . . . . .

"Q. Well, as a narcotics officer, what was your opinion

at that time as to what was in the bindles? A. It was my opinion they contained heroin.

"... . . . . . . . . . .

"Q. And did you proceed after the defendant? A. Yes.

"Q. Then what happened? A. We stopped the defendant on the street, approximately a hundred or a hundred and fifty feet south of the location where I had recovered the item, and questioned him regarding the item.

"... . . . . . . . . . .

"Q. Then what happened after you had this conversation with the defendant? A. We placed the defendant under arrest and took him to the Police Administration building narcotics office.

"... . . . . . . . . . .

"Q. What was in these bindles? A. I only opened one, due to the fact we were going to have a check for [finger] prints. I opened one and observed a white powder in it which resembled heroin."

Defendant told the officer that he (defendant) owned a 1960 Mercury automobile of a certain description bearing license number UCL 760. He stated that the car was at his home on Raleigh Street and that he had arrived at the Broadway area in a streetcar. No keys were found on defendant.

Approximately one hour after the arrest Officer Dismukes and his partner returned to the scene of the arrest. They found a Mercury automobile answering the description given them and having license number UCL 760. It was parked at the curb across the street from the place of defendant's apprehension. The automobile was locked. A search was made in the vicinity. Near a fence about 10 feet from the rear of the automobile another Pall Mall package was found. It contained three white paper bindles. Officer Dismukes opened one bindle. Its contents resembled heroin. This package was not shown to defendant.

Officer Dismukes initialed the contents of the Pall Mall package allegedly dropped by defendant near the building just prior to his arrest. He placed it in a small envelope and then sealed the envelope. This envelope was itself People's Exhibit 2-A, which the officer identified by writing he had placed thereon at the time. The individual papers making up the cigarette package and its contents, other than the powder within, were People's Exhibits 2-B through 2-I.

The officer then initialed the contents of the Pall Mall package allegedly found near defendant's car. He placed it in a

small envelope which he sealed. This envelope was itself People's Exhibit 1-F, which the officer identified by writing he had placed thereon. The individual papers making up this cigarette package and its contents, other than the powder within, were People's Exhibits 1-A through 1-E. People's Exhibit 1-C was a sheet of paper which the officer identified by the initials "M.D." he had placed thereon. It was a part of the contents of the Pall Mall package.

Both of these smaller envelopes were then placed in a large manila envelope and sealed with wax. The officer placed his thumbprint on the seal. The large envelope was booked at central property and became People's Exhibit 3.

Lieutenant King was a forensic chemist assigned to the scientific investigation division. It was stipulated that he was qualified to testify as an expert witness in this matter.

Lieutenant King testified that he received People's Exhibit 3 from the central property division on September 25, 1961, and broke the seal. Inside were the two cigarette packages. One contained six bindles of about 5 grains each. The other contained three bindles of about 3 grains each.

The cigarette package purportedly dropped by defendant, the contents of Exhibit 2-A, he labelled as "W.K.-1." The bindles marked with his initials, consisting of the contents of People's Exhibits 2-B, 2-C and 2-D were analyzed. In his opinion they contained heroin.

The contents of People's Exhibit 1-F, consisting of the Pall Mall package and contents found near defendant's automobile, Lieutenant King designated and marked as "W.K.-2." He analyzed one of the bindles and in his opinion it contained heroin. His analysis completed, he turned over the large manila envelope (People's Exhibit 3) and its contents to an Officer Miller.

Officer Miller was assigned to the comparative analysis section of the scientific investigation division. He stated his academic and practical background in connection with latent fingerprint work.

On September 25, 1961, Officer Miller, in the crime laboratory, received People's Exhibit 3 and its contents from Lieutenant King. Items marked "W.K.-2" were segregated from those marked "W.K.-1." The "W.K.-2" items were initialed "2 D.J.M."

People's Exhibits 2-B through 2-G contained a white powdery substance. Officer Miller removed the powder and placed

it in a vial (People's Exhibit 4) which he initialed. It was stipulated that the vial contained heroin.

Officer Miller also removed the white powdery substance from People's Exhibits 1-C through 1-E and placed it in a vial (People's Exhibit 5). It was stipulated that this vial contained heroin.

Exhibits 1-A through 1-F were processed chemically for the purpose of raising possible fingerprints. After deciding that certain visible prints were suitable for photographing, Officer Miller took these evidentiary materials to the photo laboratory. All the exhibits were then collected, ''W.K.-1'' and ''W.K.-2'' being placed in separate plastic bags, and both bags were replaced in the large manila envelope (People's Exhibit 3) and the envelope was returned to central property.

Officer Smith had been assigned to the latent fingerprint section, scientific investigation division, for over seven years. He testified as to his qualifications.

People's Exhibit 6 was a sheriff's office fingerprint card with fingerprints inked thereon. On October 2, 1961, at the Hall of Justice, Officer Smith had placed defendant's fingerprints on the card.

On People's Exhibit 1-C, a part of the contents of the Pall Mall package found near defendant's automobile, there had appeared about 50 to 60 per cent of a fingerprint.

Officer Miller had compared those prints on the fingerprint card (People's Exhibit 6) with the partial print appearing on Exhibit 1-C and in his opinion the partial print corresponded to the left thumbprint of defendant on the fingerprint card.

Defendant testified on direct examination in part as follows:

''Q. Now, you have heard the testimony about People's 1 and People's 2, the papers here that contained heroin. A. Yeah, I heard it this morning.

''Q. Did you have any of these papers or any heroin on your person at any time on this night? A. Certainly not.

''. . . . . . . . . . .

''Q. Now, at any time did you drop any Pall Mall package containing heroin near where—well, strike that question.

''Did you drop any heroin, any Pall Mall cigarette packages containing heroin, at any place in any area around where the officers arrested you? A. I don't even know what it looks like, to be truthful.''

On cross-examination the following appears in the transcript:

"Q. You smoke cigarettes? A. Yes.

"Q. What kind? A. Pall Malls.

"Q. You smoke Pall Malls, don't you? A. Yes."

The defendant's various contentions relate to purported errors which allegedly occurred during the preliminary hearing. Under the Rules on Appeal of the California Rules of Court we have had brought to this court the original file and proceedings in this case. The gist of defendant's argument is that he was erroneously deprived of his rights by virtue of his attorney stipulating, *at the preliminary hearing,* that the powdery substance was heroin.

The reporter's transcript of the proceedings at the preliminary hearing discloses the following in pertinent part:

"THE COURT: *People vs. Antonio Diaz Gomez.*

"MISS PAYNE: Ready for the People, your Honor.

"MR. MEYERSON: The defendant is ready, your Honor.

"THE COURT: Let the record show the defendant is present with counsel.

"MISS PAYNE: I show the court a brown manila envelope, and ask that it and its contents be marked People's Exhibit 1 for identification.

"THE COURT: It may be so marked.

"MISS PAYNE: *For the purpose of the preliminary hearing, the People offer to stipulate that William King be deemed called, sworn, and testified that he is a qualified forensic chemist, employed by the Los Angeles Police Department as such;*

"That he did on the 25th day of September, 1961, receive from the Property Division of the Los Angeles Police Department, this package which was sealed with red sealing wax;

"That he took it to the Chemistry Laboratory of the Los Angeles Police Department, and there opened it by cutting around the red sealing wax seal, and examined the contents thereof, and that he found the following:

"Six bindles of powder of about 5 grains each;

"That he tested two, and marked them with his initials, W.K., and the numeral 1;

"Also, that he found therein three bindles of powder of about 3 grains each. That he intialed one, and marked it W.K. 2.

"That he did make a chemical and physical examination thereof, *and formed the opinion that W.K.-1 and W.K.-2 each contained heroin.*

"That he thereupon prepared this report, placed all the items into the original container, closed it and sealed it with red sealing, and returned it to the Property Division of the Los Angeles Police Department.

"MR. MEYERSON [i.e. defense counsel] : *I will so stipulate . . .*

" . . . . . . . . . .

"MR. MEYERSON : *So stipulated.*

"MISS PAYNE : May it be further stipulated——

"MR. MEYERSON : *For the purpose of the preliminary hearing.*

"THE COURT : Yes.

"MISS PAYNE : *For the purpose of the preliminary hearing,* that on this 3rd day of October, 1961, the package, People's Exhibit 1, was taken from the Property Division of the Los Angeles Police Department in a sealed condition and brought to Division 43 of the Municipal Court by W. E. Dismukes, a police officer.

"MR. MEYERSON : *So stipulated.*

"MISS PAYNE : May it be further stipulated that on September 25, 1961, People's Exhibit 1, was received by Dan Miller from Officer King in the Los Angeles Police department [*sic*] laboratory, and that Mr. Miller removed the powder from the bindles and placed it in glass containers, numbers corresponding to those in the original packages; and that Mr. Miller developed by chemical process a fingerprint on a paper bindle wrapper contained in People's Exhibit 1, and photographed that fingerprint?

MR. MEYERSON : *So stipulated.*" (Emphasis added.)

As is apparent from the above set forth portions of the reporter's transcript of the preliminary hearing, defendant did not make any objections to the stipulations entered into by his defense attorney. ▇▇▇ It is aptly stated in *People* v. *Washington,* 204 Cal.App.2d 206, 208 [22 Cal.Rptr. 185] :

"[4] An attorney, charged with the defense of his client's interest, must be allowed to exercise his own best judgment in the conduct of the case, and in the absence of some complaint by the defendant in the trial court, the acts of his counsel are imputed to him. (*People* v. *Wren,* 140 Cal.App.2d 368 [295 P.2d 54] ; *People* v. *Jones,* 177 Cal.App.2d 420-422 [2 Cal.Rptr. 305].) "

▇▇▇ The above set forth stipulation at the preliminary hearing in nowise constituted a plea of guilty. Defendant's

reliance on *People* v. *Rogers,* 56 Cal.2d 301 [14 Cal.Rptr. 660, 363 P.2d 892] is misplaced.

In the *Rogers* case, *supra,* defendant was charged with murder. He pleaded not guilty and waived a jury trial. Prior to the admission of evidence at the trial, counsel stipulated that the trial court would be restricted to a finding of *either* second degree murder *or* manslaughter. Defendant was found guilty of second degree murder. The Supreme Court reversed the conviction stating at page 305:

" [1] The vice of the stipulation, . . . is that it constitutes in practical effect a withdrawal of defendant's plea of not guilty and the entry of a plea of guilty to either murder in the second degree or manslaughter, not made personally by defendant but by his counsel. At no time during the trial did defendant personally change his plea or make reference to the stipulation. Section 1018 of the Penal Code specifically provides in part that '. . . every plea must be put in by the defendant himself in open court,' and that this 'section shall be liberally construed to effect these objects and to promote justice.' "

There was no error at the preliminary hearing. Defendant was not, contrary to his arguments, deprived at that time of the right of confrontation of the chemist.

In addition to the fact that there was no error, defendant did not raise his objections to the preliminary hearing until after he was convicted at a trial upon the merits.

Penal Code section 995 provides in pertinent part as follows:

"The . . . information must be set aside by the court in which the defendant is arraigned, upon his motion . . . .

". . . . . . . . . . . .

"If it be an information:

"1. That before the filing thereof the defendant had not been legally committed by a magistrate.

"2. That the defendant had been committed without reasonable or probable cause."

Penal Code section 996 provides that:

"If the motion to set aside the . . . information is not made, the defendant is precluded from afterwards taking the objections mentioned in the last section."

The motion to set aside an information must be made before defendant demurs or enters a plea and if the motion is not so made the objections which could be raised are waived. (See *People* v. *Evans,* 185 Cal.App.2d 331 [8 Cal.Rptr. 410].)

It would serve no useful purpose to unduly extend this

opinion. Defendant's contentions have been examined and found to be without merit. The judgment and denial of defendant's motion for a new trial are, and each of them is affirmed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied November 14, 1962, and appellant's petition for a hearing by the Supreme Court was denied December 26, 1962.